**CHRIST LUTHERAN CHURCH,**
Plaintiff/Appellee,

v.

**EQUITABLE CHURCH BUILDERS,**
**INC., Defendant/Appellant.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

June 28, 1995.

Permission to Appeal Denied
by Supreme Court
Oct. 23, 1995.

Charles C. Morrow, Morrow, Bowhan & Associates, Nashville, for defendant/appellant.

Robert L. Estes, John E. Anderson, Stewart, Estes & Donnell, Nashville, for plaintiff/appellee.

## OPINION

CANTRELL, Judge.

Following a jury verdict in this breach of contract case, the trial court entered a judgment for the plaintiff in the amount of $27,759. We affirm.

### I.

The members of plaintiff Christ Lutheran Church had outgrown their old church building, and purchased some property on which to build a new one. Rather than hire a general contractor to erect the new structure, the members of the plaintiff's properties committee entered into a contract with defendant Equitable Church Builders on January 19, 1989, whereby many organizational, advisory and supervisory functions relating to the proposed construction were delegated to the defendant. The fee for the defendant's services was projected to be $71,686.

In accordance with the contract, the defendant secured the services of an architect, arranged for all necessary permits and surveys, and found an on-site superintendent, Tom McCrary, whose job was to supervise the construction on a day-to-day basis. Though Equitable Church builders selected Mr. McCrary and set the amount of his compensation, his salary was paid by the church.

The work apparently proceeded without incident until the time came to erect the prefabricated roof trusses atop the east and west walls of the building. On September 26, 1989, the trusses were lifted into place, and Mr. McCrary fastened them to the top plates of both walls by toenailing, even though the architect's instructions were that the trusses were to be fastened to the west wall only. Shortly thereafter, the trusses fell, knocking down the east wall, and causing the damages from which this suit arose.

The witnesses at trial advanced several different theories to explain the collapse of the wall, including failure to follow the architect's instructions, failure to brace the wall, defective design of the trusses, and damage to the trusses on delivery. Under any of the theories that were suggested, we believe that there was sufficient evidence for the jury to conclude that the defendant breached the contract by failing to adequately supervise the work, and that this failure was a proximate cause of the plaintiff's damages.

### II.

In construing a contract, we must resolve any ambiguities in it against the party that drafted it. See *Hanover Insurance v. Haney*, 221 Tenn. 148, 425 S.W.2d 590, 592 (1968). The defendant drafted the contract in this case. Contract provisions included a fairly well-defined division of organizational responsibilities between the church ("the Owner"), Equitable Church Builders ("the Agent") and the job superintendent. The division of supervisory responsibilities between the same three parties is not nearly so well defined.

The church was to exercise a kind of general oversight by its power to grant or withhold approval of the architectural plans, the

hiring of labor, the awarding of sub-contracts and the purchase of materials, which were all to be arranged or procured by Equitable Church Builders. The contract did not require the church to supervise ongoing construction. However, the chairman of the church's property committee, Mr. Marlyn Krebs, testified that he was frequently on the job site, observing the construction, conferring with superintendent McCrary, and acting as a liaison between Mr. McCrary and the committee.

As stated earlier, the job superintendent was to be responsible for the day-to-day supervision of the project. The argument of Equitable Church Builders seems to be that insofar as the collapse of the wall was due to his actions, they could not be held liable for the resulting damages. They contend that since his salary was paid by the church, he was not the agent of the defendant, but rather an employee of the church. They point out that 1989 and 1990 W–2 forms admitted into evidence listed Mr. McCrary's employer as Christ Lutheran Church.

However, even accepting at face value the contention that Mr. McCrary was the agent of the church rather than of the defendant, Equitable Church Builders cannot negate its own duty of supervision, which must necessarily include some supervision over the actions of Mr. McCrary:

> SUB–CONTRACTS AND MATERIAL PURCHASES—GENERAL SUPERVISION:
>
> The Agent agrees to bear the expense of taking all sub-contract bids and material prices and preparing cost estimate (sic) from these quotations and proposals, prior to start of actual construction. *The agent also agrees to furnish the necessary periodic job inspections and general supervision on the job.* (emphasis added).

Further, Equitable Church builders retained a substantial responsibility for the quality of the work performed:

> SCOPE OF THE WORK:
>
> It is agreed that the Agent will act in behalf of the Owner in performing all work necessary to expedite the completion of the construction, to the best of its ability, in the most economical way while maintaining quality workmanship. . . .

Equitable Church Builders attempts to evade its responsibility under the above clause by reference to the following:

> MATERIALS & LABOR:
>
> . . . .
>
> Donated labor, if any, shall be under the direct supervision of the job superintendent, who retains the primary responsibility for good workmanship.

However, we are of the opinion that this clause does not relieve the defendant of its supervisory obligations, but rather assures the owner that the job superintendent will make sure that the use of volunteer labor will not result in a reduction in the quality of the work below the standards required of paid labor.

### III.

■ If Mr. McCrary is to be considered an employee of the church, then Mr. David Dierks, President of Equitable Church Builders was the only representative of the defendant who performed any supervisory function at all. He testified that he went to the job site every two weeks or so, to see how the work was progressing. He would meet with the superintendent and talk over any problems that he might have. He never made a detailed inspection of the work, and never directly supervised what Mr. McCrary was doing.

■ After the accident, Mr. Dierks did not investigate its cause. However, the architects dispatched Terry Scholes, a professional engineer, to observe the construction at the site. The trial court affirmed the defendant's objection to the admission of Mr. Scholes' testimony, and to the letters he wrote to the architects, on the ground of relevance. We believe, however, that even though Mr. Scholes dealt with construction deficiencies other than the ones that led to the collapse of the east wall, his testimony is relevant to the question of whether the defendant was exercising any kind of meaningful supervision over the work in progress. The testimony and evidence are in the record on an offer of proof.

Mr. Scholes found "numerous items which were not constructed per the structural documents." He also said "I am concerned that the contractor has not taken the time to coordinate the structural and architectural drawings." His Job Observation Report listed eight corrective measures that needed to be taken on the roof framing.

The defendant also called Mr. William Price, a civil engineer, who had been sent to the site to investigate the cause of the collapse. Among other things, Mr. Price testified that the east wall had not been braced, as had been required by the plans, making it less able to withstand the outward pressure exerted by the weight of the roof trusses. We believe that prior to the erection of the trusses, the presence or absence of such bracing would have been evident on even a cursory inspection of the worksite, but apparently no such inspection was made by Mr. Dierks.

### IV.

Though the general language of the contract does not permit precise definition of the extent to which it obligates Equitable Church Builders to furnish supervision on the job site, it also does not permit the defendant to negate the existence of such an obligation. The jury's verdict indicates that it found that the defendant had failed to perform its duties of general supervision. "Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Rule 13(d), Tenn.R.App.P.

We find there was a considerable quantity of material evidence to support the jury verdict, and we affirm the judgment of the trial court. Remand this cause to the · Circuit Court of Davidson County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellant.

TODD, P.J., (M.S.) and LEWIS, J., concur.